# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | 8:05CR437 |
| ) | |
| vs. ) | REPORT AND |
| ) | RECOMMENDATION |
| GONZALO USCANGA-RAMIREZ, ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on the motion to suppress filed by the defendant Gonzalo Uscanga-Ramirez (Uscanga-Ramirez) (Filing No. 10). The defendant is charged in an Indictment with the possession of a firearm while being an alien illegally in the United States in violation of 18 U.S.C. § 922(g)(5)(A). Uscanga-Ramirez seeks to suppress all evidence obtained from the search of a residence at 1919 Griffith Street, Lincoln, Nebraska, on November 15, 2005.

An evidentiary hearing on the motion was held on February 1, 2006. Uscanga-Ramirez was represented by Assistant Federal Public Defender Michael F. Maloney and the United States was represented by Assistant U.S. Michael D. Wellman. Chandler Thompson, a certified interpreter in the Spanish language, was available as an interpreter by remote telephone hook-up. The court heard the testimony of Officers John Brandl (Officer Brandl) and Kevin D. Hinton (Officer Hinton) of the Lincoln Police Department (LPD). A transcript (TR.) of the hearing was filed on February 6, 2006 (Filing No. 17). There was no post-hearing briefing.

## FINDINGS OF FACT

At approximately 1:20 in the afternoon on November 15, 2005, Officer Brandl was in uniform and driving a marked LPD patrol car and was patrolling the north central area of Lincoln, Nebraska (TR. 5). At 1:23 p.m. Officer Brandl received a police radio call of a disturbance in progress at 1919 Griffith Street in Lincoln (TR. 6). Ina Olson (Mrs. Olson) reported that her daughter, Lisa, was being held against her will by Lisa's husband (TR. 7). Mrs. Olson stated she would be in a gray car waiting out in front of the residence (TR. 8).

Officer Hinton was a backup officer to Officer Brandl (TR. 7). Both officers arrived at 1919 Griffith Street three to four minutes after receiving the call (TR. 8). As the officers arrived, Officer Brandl observed Lisa walking out the front door and down the sidewalk towards the officers (TR. 8). Lisa's mother was seated in a parked car in front of the residence (TR. 9). Officer Brandl got out of his patrol car and spoke with Lisa (TR. 9). When Officer Brandl asked Lisa what was going on since her mother reported that Lisa's husband was holding Lisa against her will and she could not leave, Lisa stated that was not true and she was going to leave with her mother (TR. 9). As Officer Brandl walked Lisa to her mother's car, he asked Lisa where her husband was, if he was okay and if there would be a problem when she came back to the residence (TR. 9). Lisa stated her husband was inside the house where he locked himself in a bathroom (TR. 9-10). Lisa stated her husband was very upset that Lisa was breaking up with him and going to leave him (TR. 10). Lisa also stated her husband had a gun (TR. 10). When asked if her husband threatened Lisa or himself, Lisa stated no (TR. 10).

Officer Brandl decided to check on the husband's welfare anyway since he did not want to leave a despondent person who had locked himself in a room with a gun (TR. 10). Officer Brandl asked Lisa if the officers could go into the residence and check on her husband (TR. 11). Lisa said that was fine and gave the officers directions on how to get through the front door and locate the bathroom where her husband was located (TR. 11). Officer Brandl asked Lisa and her mother to remain in the area until they checked on Lisa's husband (TR. 11). Both agreed (TR. 11).

Officers Brandl and Hinton then entered the house and walked across the living room toward the bathroom (TR. 12). At that time a Hispanic male walked out of the adjoining kitchen (TR. 12). The officers had the male identify himself and determined he was not Lisa's husband (TR. 12). The Hispanic male, in broken English, directed the officers to a bedroom where Lisa's husband was to be located (TR. 12). When the officers went to the door to open it, the door was locked (TR. 12). The officers knocked on the door, identified themselves as police, and said they needed to talk to Lisa's husband right away to make sure he was okay (TR. 12). Lisa's husband, Uscanga-Ramirez, unlocked and opened the bedroom door (TR. 12). The officers told Uscanga-Ramirez that his wife

2

said he was upset over their breaking up, that he had a gun, and that the officers were concerned he might want to harm himself or his wife with the gun (TR. 13). Officer Brandl was standing at the foot of the bed in the bedroom and Uscanga-Ramirez was sitting on the bed at the foot of the bed (TR. 14). Officer Hinton was standing between Uscanga-Ramirez and the doorway near the center of the bed (TR. 31). Officer Brandl asked where the gun was so they could check it before they leave (TR. 13-14). Uscanga-Ramirez said there was no gun and that his wife was lying (TR. 14). Officer Hinton noticed the bed was unmade and noticed a pillow that was not positioned at the head of the bed (TR. 31). Officer Hinton reached over on the bed next to him and picked up the pillow on the bed revealing a .22 caliber revolver gun (TR. 14). Uscanga-Ramirez was handcuffed at that time (TR. 17). No *Miranda* warnings were issued by the officers (TR. 18). When asked how he got the firearm, Uscanga-Ramirez stated he bought it from a friend on the street about six months ago (TR. 15). When asked if he had a permit for the gun, Uscanga-Ramirez stated he did not (TR. 15). The officers seized the .22 caliber revolver (TR. 15). Officer Brandl walked Uscanga-Ramirez out to the police patrol car, and Officer Hinton stayed with the weapon in the residence (TR. 21). Officer Brandl consulted with his supervisor who decided that, until further investigation, the .22 caliber gun would be seized as being in violation of the handgun law but otherwise not to issue Uscanga-Ramirez a citation or arrest him (TR. 15). Uscanga-Ramirez was then released from custody (TR. 21).

## LEGAL ANALYSIS

Uscanga-Ramirez asserts (1) there was no exigency allowing the LPD officers warrantless entry into the residence and, as such, the officers' entry was unlawful, (2) the search of the bedroom was unlawful, and (3) the interrogation of Uscanga-Ramirez was without the benefit of *Miranda* advice. Accordingly, Uscanga-Ramirez seeks the suppression of the firearm found in the bedroom and any statements made by Uscanga-Ramirez to the LPD officers following the officers' entry into the residence. The government asserts the LPD officers' entry into the residence was with the consent of Uscanga-Ramirez's wife. Further the government asserts Uscanga-Ramirez was not in

custody when interrogated by the LPD Officers, and that the firearm was seized as being in violation of Nebraska law.

### A.  Entry Into 1919 Griffith Street

Officers Brandl and Hinton responded to an emergency call at 1919 Griffith Street that a woman was being held against her will in the residence.  Upon arrival, the officers encountered Lisa, Uscanga-Ramirez's wife, as she emerged from the residence and walked toward her mother's car.  The exigency of a person held against her will which was initially reported was dissipated when Lisa stated she was leaving with her mother after Lisa and Uscanga-Ramirez got into a fight about Lisa leaving Uscanga-Ramirez.  However, the exigency was reignited when Lisa informed the officers that Uscanga-Ramirez was despondent, had locked himself in a room, and had a gun.  The officers did not have a warrant to enter the residence but were faced with an emergency situation with concern for the welfare of Uscanga-Ramirez who was reportedly despondent and locked in a room with a gun.

Exigent circumstances will justify the entry of a residence without a warrant.  ***Mincey v. Arizona***, 437 U.S. 385, 392 (1978).  The critical time for determining whether an exigency exists "is the moment of the warrantless entry by the officers onto the premises of the defendant."  ***United States v. Morgan***, 743 F.2d 1158, 1162 (6th Cir. 1984). Officers Brandl and Hinton had a concern for the welfare of Uscanga-Ramirez.  Uscanga-Ramirez asserts that the officers' concern for his welfare was commendable, but did not constitute exigent circumstances justifying a warrantless entry into the residence.  While the officers' concern for Uscanga-Ramirez's welfare is commendable and their failure to investigate may have been subject to criticism and subsequent litigation in the event Uscanga-Ramirez did harm to himself if the officers did not intervene, the court need not determine whether the situation at 1919 Griffith Street on the afternoon of November 15, 2005, constituted exigent circumstances justifying a warrantless entry into the residence since Lisa gave the officers permission to enter the residence and check on Uscanga-Ramirez.

No warrant is necessary for police officers to enter a residence when the officers obtain the voluntary consent of a person who has the authority to give such consent. ***Illinois v. Rodriguez***, 497 U.S. 177 (1990).  Any reasonable police officer would believe that Lisa would have the authority to consent to an entry of the residence where she and her husband, Uscanga-Ramirez, lived.  Accordingly, Officers Brandl and Hinton did not violate Uscanga-Ramirez's Fourth Amendment rights by entering 1919 Griffith Street without a warrant on November 15, 2005.

### B.  Entry Into the Bedroom

The officers had Lisa's consent to enter the residence and the permission was not restricted as to any part of the residence.  Even so, the officers had Uscanga-Ramirez's consent to enter the locked bedroom.  The officers knocked on the door and announced their presence and purpose requesting Uscanga-Ramirez to open the door.  Uscanga-Ramirez voluntarily opened the door and allowed the officers to enter the bedroom.  Thus, Uscanga-Ramirez consented to the officers' entry and no warrant was required for the officers to do so.  There was no Fourth Amendment violation in the officers' entry into the bedroom.

### C.  Discovery of the Firearm

Once in the bedroom, the officers stood next to the bed on which Uscanga-Ramirez was seated.  Officer Hinton began to look for a firearm that may be lying around in plain view (TR. 31).  Officer Hinton noted the unmade bed with a pillow, which was not positioned at the head of the bed.  The pillow was within arms' reach of Uscanga-Ramirez.  Officer Hinton picked up the pillow and observed the .22 caliber revolver in plain view.  Officer Hinton recalled no statement by Uscanga-Ramirez about the firearm prior to Officer Hinton's discovery of the firearm (TR. 32).  Accordingly, the picking up of the pillow cannot be justified as incident to arrest since Uscanga-Ramirez made no statements about the firearm which would constitute probable cause for Uscanga-Ramirez's arrest.  Clearly, Officer Hinton's lifting of the pillow, revealing the presence of the .22 caliber revolver was a search within the meaning of the Fourth Amendment.  **See *Arizona v. Hicks***, 480 U.S.

321 (1987) (moving a stereo a few inches to check a serial number after the officer lawfully entered an apartment under exigent circumstances constituted a search under the Fourth Amendment).  Placement of a pillow over a firearm to hide it from view, demonstrates Uscanga-Ramirez expected privacy concerning the presence of the firearm under the pillow.  Such expectation of privacy was reasonable and one which society would deem reasonable.  **See generally** *Katz v. United States*, 389 U.S. 347 (1967).  Consequently, the issue is whether a warrant was required for Officer Hinton to lift the pillow on the bed in order to observe the firearm.

The court finds no warrant was required.  In this case, officers were performing their community caretaking functions.  These functions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *United States v. Smith*, 162 F.3d 1226 (8th Cir. 1998).  "The ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady*, 413 U.S. at 439.  It is entirely and objectively reasonable for an officer observing a misplaced pillow in the middle of the bed on which a person was sitting and which was within the reach and grasp of the person, to simply check under the pillow for a dangerous weapon.  This action followed a report that this person was distraught, had locked himself in a room, and had a gun.  The action by Officer Hinton was consistent with a community caretaking function as well as checking for the safety of himself and Officer Brandl.  **See** *Terry v. Ohio*, 392 U.S. 1 (1968).   Accordingly, the court finds Officer Hinton legally observed the firearm, and the firearm should not be suppressed from evidence.

### D.  Uscanga-Ramirez's Statements

Uscanga-Ramirez also seeks to suppress any statements he may have made to the officers because they were made without the benefit of *Miranda* advice.  Upon the discovery of the firearm, Uscanga-Ramirez was handcuffed.  Under the circumstances, the court considers that Uscanga-Ramirez was in custody for the purposes of providing a *Miranda* advice.  Clearly, his movement was restricted within the bedroom and the residence.  He had two armed officers in uniform standing next to him.  Any reasonable person would believe that he was in custody under such a situation even though the person

6

was not formally arrested. Since no *Miranda* warnings were provided to Uscanga-Ramirez, Uscanga-Ramirez's statements to the officers following their questioning of Uscanga-Ramirez about the firearm and where Uscanga-Ramirez obtained the firearm should be suppressed from evidence.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATTALION** that Gonzalo Uscanga-Ramirez's motion to suppress (Filing No. 10) be granted as to statements made by Uscanga-Ramirez to the officers after Uscanga-Ramirez was handcuffed but otherwise be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 15th day of March, 2006.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge